IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NCO FINANCIAL SYSTEMS, INC., | : |
| | : |
|     Plaintiff, | : |
| | :   Civil Action No.: L-11-1020 |
|     v. | : |
| | : |
| MONTGOMERY PARK, LLC | : |
| | : |
|     Defendant. | : |

o0o

**MEMORANDUM**

This is a breach of contract action brought by Plaintiff NCO Financial Systems, Inc. ("NCO") against its landlord, Defendant Montgomery Park, LLC ("Montgomery Park"). NCO alleges breach of contract (Count I), unjust enrichment (Count II), and fraud (Count III), and seeks a declaratory judgment regarding its purported exercise of rights under the early termination clause of its lease (Count IV). Montgomery Park now moves to dismiss Counts I–III. The issues have been fully briefed, and the Court finds oral hearing unnecessary. See Local Rule 105.6 (D. Md. 2011). For reasons to follow, the Motion will be DENIED by separate Order of even date.

**I.    Background**

NCO is a corporation that provides business process outsourcing. Montgomery Park provides leasable office space and related services to commercial tenants. On March 15, 2003, NCO and Montgomery Park entered into an Office Lease Agreement (the "Lease") for office space at Montgomery Park Business Center (the "Building") in Baltimore, Maryland. The

1

Lease, which by its terms is governed by Maryland law, stated that Montgomery Park would lease NCO "approximately 106,267 rentable square feet of floor area" (the "Premises") for twelve years, expiring on March 31, 2015. Compl. Ex. 1, Docket No. 1.

Under the terms of the Lease, rent is calculated based on the number of "rentable square feet" of the Premises.[1] "Rentable square feet" is calculated by multiplying the number of "usable square feet" by 1.12. Thus, the Lease effectively represented that there were approximately 94,881 usable square feet on the Premises.

At some point in 2010, NCO opted to independently evaluate the Premises and received plans for the Building from Montgomery Park.[2] Using standards published by the Building Managers and Owners Association ("BOMA"), NCO calculated the usable square footage of the Premises to be 90,000, which corresponds to 100,800 rentable square feet. Thus, NCO contends that it has been overpaying rent since 2003, based on Montgomery Park's false representation that the Premises is 5,467 rentable square feet larger than it actually is. NCO calculates the total overcharge of rent to be at least $700,000.

On February 28, 2011, NCO filed suit in the Eastern District of Pennsylvania. On March 25th, Montgomery Park filed a Motion to Dismiss, or, in the Alternative, to Transfer Venue. The parties subsequently agreed to transfer the case to this Court. The portion of Montgomery Park's Motion requesting dismissal pursuant to Fed. R. Civ. P. 12(b)(6) remains pending.

---

[1]   For the first year, Base Rent was $15 per rentable square foot, for a total of $1,594,005. Each following year, Base Rent was increased by a percentage of the Consumer Price Index as published by the U.S. Department of Labor.

[2]   NCO has not stated when it received the building plans or why it chose to conduct an independent evaluation at that time.

**II.     Standard of Review**

"[T]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Presley v. City of Charlottesville, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks and alterations omitted) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)).  When ruling on such a motion, the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009).

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citations and alterations omitted).  Thus, the plaintiff's obligation is to set forth sufficiently the "grounds of his entitlement to relief," offering more than "labels and conclusions." Id. (internal quotation marks and alterations omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

### III. Analysis

Montgomery Park advances three main arguments in support of its position. First, it contends that Maryland's three-year statute of limitations bars NCO's claims. Second, it argues that in signing the Lease, NCO conclusively acknowledged that the size of the Premises was as represented therein. Finally, it urges that the Lease's use of the qualifier "approximately" precludes any challenge based on the square footage of the Premises.

#### a. Statute of Limitations

Under Maryland law, subject to certain exceptions not relevant here, "[a] civil action at law shall be filed within three years from the date it accrues . . . ." Md. Code Ann., Cts. & Jud. Proc. § 5-101. Maryland courts have adopted the discovery rule as a means of determining when the claim begins to accrue for purposes of the statute of limitations. The discovery rule "tolls the accrual of the limitations period until the time the plaintiff discovers, or through the exercise of due diligence, should have discovered, the injury." Frederick Rd. Ltd. P'ship v. Brown & Sturm, 360 Md. 76, 94 (2000).

Montgomery Park argues that "with reasonable diligence, NCO, a commercial tenant, could have independently verified the actual square footage of the Premises at the time it executed the Lease, or at any time during its occupancy." Pl.'s Reply 8, Docket No. 23. Nevertheless, whether a plaintiff's failure to discover its cause of action was due to a lack of due diligence is ordinarily a question of fact for the jury. Frederick Rd. Ltd. P'ship, 360 Md. at 96 (quoting O'Hara v. Kovens, 305 Md. 280, 295 (1986)). Moreover, Maryland courts have not specifically addressed the question of when a purchaser or tenant is reasonably on notice of a discrepancy in square footage, and the Court's research reveals little consensus in other jurisdictions. Compare ELM Retirement Center, LP v. Callaway, 226 Ariz. 287, 290 (Ct. App.

2010) (affirming, on limitations grounds, dismissal of economic loss doctrine tort claim because the complaint did not allege facts establishing that purchaser exercised reasonable diligence in discovering true square footage of home or offering adequate explanation for failure to do so) with <u>Gaston v. Hartzell</u>, 89 N.M. 217, 218 (Ct. App. 1976) (finding that cause of action for misrepresentation of square footage accrued only when F.H.A. appraisal revealed discrepancy, four years after purchase). <u>See also</u> <u>Katke v. Sears Mortg.</u>, G027304, 2003 WL 658571 (Cal. Ct. App. Feb. 28, 2003) ("The trial judge's statement that 'if the lack of approximately 800 square feet of living space is material, it must have been perceived or suspected in the first five years of occupancy, meaning the statute of limitations has passed' is merely an ipse dixit. Whether it is a valid conclusion depends on more specific facts.")

The Court cannot say, as a matter of law, that even a sophisticated commercial tenant must be aware of any material discrepancy in square footage from day one. Furthermore, at this stage of the litigation there is no factual record as to what NCO knew regarding the true square footage of the Premises or when it gained the information that would reasonably have put it on notice. The Court will, therefore, deny Montgomery Park's Motion to Dismiss NCO's claims on this basis, without prejudice to Montgomery Park's right to renew its argument at summary judgment.

### b. Acceptance of Premises

Montgomery Park next invokes a provision of the Lease providing that "[NCO] shall for all purposes of this Lease be deemed to have accepted the Premises . . . and to have acknowledged the Premises to be in the condition required hereunder . . . ." Def.'s Mot to Dismiss 22, Docket No. 5. In signing the Lease, Montgomery Park contends, NCO agreed that

the size of the Premises was as represented—that is, "approximately 106,267 rentable square feet"—regardless of its actual dimensions.

Under Maryland law, courts must give effect to the clear terms of a contract. "[W]hen the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed." Gen. Motors Acceptance Corp. v. Daniels, 303 Md. 254, 261 (1985). In this case, however, it is far from unambiguous that the phrase "the condition required hereunder" addresses the size of the Premises.

Giving the term its ordinary meaning, "condition" calls to mind quality, state of repair, or the fitness of a space for the purpose which its prospective tenant intends. Indeed, the provision here at issue appears in Article V of the Lease, captioned "Improvements to Premises." The provision follows a section labeled "Initial Improvements," detailing certain improvements that Montgomery Park agreed to undertake "for the purpose of initially preparing the Premises for occupancy" and referencing building specifications including "HVAC and electrical specifications and backup electricity sources." See Compl. Ex. 1, § 5.01. Although exhibits to the Lease incorporated therein by reference were not included with the Complaint, nothing in § 5.01 of the Lease appears to address any change to the Premises that would affect the square footage. A fuller reading of the acceptance clause makes clear that these and other considerations bearing on the state of the Premises, rather than its size, were in the minds of its drafters. It provides:

> Except for work described in the Building Specifications (and in the plans approved pursuant thereto) remaining incomplete, the Tenant shall for all purposes of this Lease be deemed to have accepted the Premises within 25 days after the Commencement Date and to have acknowledged the Premises to be in the condition required hereunder (subject only to any mutually agreed punchlist prepared prior to Tenant's occupancy and to latent defects not

> reasonably susceptible of discovery) . . . . Landlord and Tenant shall jointly inspect the Premises at or about the Commencement Date for the purpose of developing a "punchlist" of readily observable corrective matters.

Id. § 5.02.

### c. "Approximately"

Finally, NCO would have the Court hold that any challenge to the size of the Premises as represented in the Lease must fail because the specified square footage is qualified by the word "approximately." Such a qualifier introduces an intentional note of vagueness into an otherwise precise document. It serves a useful purpose by ensuring that the parties need not concern themselves over minor deviations or calculation errors. At some point, however, a discrepancy will be large enough that "approximately" ceases to be an accurate representation and a material element of the bargained-for exchange between the parties is called into question.

On this point, the case of Eastern Service Management Co. v. United States, 363 F.2d 729 (4th Cir. 1966) is instructive. In that case, the plaintiff brought suit under the Tucker Act to recover for breach of contract for the cleaning of a federal office building. While the government's invitation to bid stated that the space to be cleaned included "approximately 129,300 square feet of office space," the actual area proved to be some 8,700 square feet larger. In affirming the district court's decision that the variance was too large to fit within the term "approximately 129,300 square feet," the Fourth Circuit explained that "[t]he meaning of the word 'approximately' can only be understood in the light of the type of contract involved and the reliance which a reasonably intelligent [plaintiff] would place on the accuracy of the figure." Id. at 731 (citing Gottlieb Contracting Co. v. United States, 353 F.2d 777 (2d Cir. 1965)). It determined that, on the facts before it, a six-percent underestimation of square footage was "not

7

trivial. . . . The use of 'approximately' is only to provide against accidental variations arising from slight and unimportant excesses or deficiencies. The error of over 6% in the occupied area is not mere rounding off or measurement error, but is caused by neglecting to include a significant portion of the building area in the computation." Id. at 732.

In the case at bar, the difference is 5,467 rentable square feet, or some 5% of the total rentable square footage as recited in the Lease. The Court will not say that such a difference is trivial as a matter of law. Whether, in light of the surrounding facts and circumstances, NCO's measurements were properly conducted and demonstrate that the Premises do not, in fact, contain "approximately 106,267 rentable square feet of floor area" are questions of fact unsuitable for treatment at the motion-to-dismiss stage. Montgomery Park's Motion will be denied, and the case will proceed to discovery.

### IV.    Conclusion

For the foregoing reasons, the Court will, by separate order of even date, DENY Montgomery Park's Motion to Dismiss (Docket No 5). A Scheduling Order will be entered to govern the course of discovery.

Dated this 14th day of May, 2012

/s/

Benson Everett Legg
United States District Judge