IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NCO FINANCIAL SYSTEMS, INC.,      :

     Plaintiff,      :

v.      :      Civil Action No. GLR-11-1020

MONTGOMERY PARK, LLC,      :

     Defendant.      :

## MEMORANDUM OPINION

THIS MATTER is before the Court on three pending motions, including Plaintiff NCO Financial Systems, Inc.'s ("NCO") Motion for Partial Summary Judgment (ECF No. 51); and Montgomery Park, LLC's ("Montgomery Park") Cross-Motion for Partial Summary Judgment (ECF No. 52) and Motion for Leave to File Sur-Reply in Further Opposition to NCO's Motion for Partial Summary Judgment (ECF No. 55).

The issues have been fully briefed and no hearing is necessary. See Local Rule 105.6 (D.Md. 2011). For the reasons that follow, NCO's Motion for Partial Summary Judgment will be granted in part and denied in part, Montgomery Park's Motion for Leave to File Sur-Reply in Further Opposition to NCO's Motion for Partial Summary Judgment will be granted in part and denied in part, and Montgomery Park's Motion for Partial Summary Judgment will be denied.

## I. BACKGROUND[1]

NCO provides clients with business process outsourcing solutions. Montgomery Park provides leasable office space to tenants and other services attendant to its property leasing business. Effective March 15, 2003, NCO and Montgomery Park entered into an Office Lease Agreement ("Lease") at the Montgomery Park Business Center located at 1800 Washington Park Boulevard, Baltimore, Maryland (the "Building").

The Lease states that NCO "leases from [Montgomery Park] . . . approximately 106,267 rentable square feet of floor area" (the "Premises"). (Pl.'s Mem. Supp. Mot. Partial Summ. J. Ex. 2, Attach. 2 ("Office Lease Agreement"), at 9, ECF No. 51-1). The Lease is for a term of twelve years, expiring in March 2015. It is undisputed that an area known to the parties as the "Bridge" is reflected in the approximate rentable square footage stated on the Lease. There is a dispute, however, as to whether the Bridge should have been included.

The Lease also requires NCO to pay rent to Montgomery Park in two components, "Base Rent" plus "Additional Rent," which includes "Real Estate Taxes" and "Operating Expenses." (Id. §§ 2.02, 2.03). The amount of Base Rent plus Additional Rent is based upon the number of "rentable square feet" of NCO's Premises. (Id. §§ 2.01, 2.02, 2.03).

---

[1] Unless otherwise noted, the following facts are taken from the Complaint and the parties' briefings on the instant motions, and are viewed in the light most favorable to the nonmoving party.

Under the Lease, the total "rentable square feet" of space is calculated by multiplying the usable square feet of the Premises by 1.12. (Id. § 2.08). Using this formula, the amount of Base Rent Montgomery Park charged NCO was based upon Montgomery Park's representation that the Premises incorporates 94,881 square feet of usable space equaling 106,267 square feet of rentable space.[2] The amount of Additional Rent NCO is obligated to pay under the Lease is based upon its proportionate share of certain expenses for the entire Building. This ratio was determined by the total rentable square footage of the NCO Premises as compared to the total rentable square footage of the entire Building. All of the costs and credits that resulted in the amount of the monthly payment due to Montgomery Park are defined by the Lease as "Rent." (Id. § 2.04(A)) (defining "Rent" as Base Rent plus "[a]ll rental obligations set forth in the foregoing provisions [Real Estate Taxes and Operating Expenses] and elsewhere in this Lease").

In 2010, Montgomery Park, at NCO's request, provided NCO with computer generated design drawings of the Building. Using the industry measurement standards published by the Building Managers and Owners Association ("BOMA"), NCO now contends the Premises actually contained only 100,800 square feet of rentable space, as

---

[2] Pursuant to the Lease, Base Rent for the first year was $15.00 per square foot of rentable space, for a total of $1,594,005. (Office Lease Agreement § 2.01(1)). After the first year of the Lease, the amount of Base Rent increased each year by a percentage determined by the Consumer Price Index published by the United States Department of Labor. (Id. § 2.01(2)).

opposed to the "approximately 106,267 rentable square feet of floor space" claimed by Montgomery Park.

Additionally, the Lease provides NCO the option of accepting janitorial services procured by Montgomery Park or procuring its own janitorial services at its own cost and accepting a "Janitorial Allowance." The "Janitorial Allowance," as defined in the lease, equals "$1.00 per usable square foot per annum towards the costs incurred in obtaining janitorial services." (Id. § 6.01). NCO is responsible for any janitorial cost that exceeds the Janitorial Allowance. (Id.) Beginning in April 2008, NCO exercised its right to provide its own janitorial services.

Finally, the Lease includes a provision that gives NCO a "Limited Right of Early Termination" ("Early Termination Provision"). (Id. § 1.05). Pursuant to this provision, NCO maintained the right to terminate the Lease after eight years, provided that NCO gave written notice to Montgomery Park ten months in advance and paid Montgomery Park a "termination fee," in two fifty-percent installments (at ten months in advance of the early termination and at three months in advance of the early termination) and calculated by ten times the amount of the monthly Rent that would be owed as of the last month of the Lease. (Id.) The text of the Early Termination Provision states, in pertinent part:

> Tenant shall have a one-time, conditional right to terminate this Lease (the "Termination Right"), effective on that date which is eight years after the Commencement

4

Date (the "Termination Effective Date"), upon Tenant's strict compliance with all of the following requirements:

(a) Tenant shall deliver to Landlord (not later than ten (10) months prior to the Termination Effective Date (such notice deadline, the "Termination Notice Deadline")) a written notice (the "Termination Notice") stating that Tenant elects to exercise this Termination Right; and

(b) Tenant shall pay to Landlord (50% simultaneously with delivery of the Termination Notice and the remaining 50% balance at least three (3) months prior to the Termination Effective Date), a termination fee (the "Termination Fee") equal to ten (10) times the monthly installment (which will be in effect as of the Termination Effective Date) of Rent (including, without limitation, all Additional Rent on account of Taxes or Operating Expenses).

If (and only if) Tenant both timely delivers the Termination Notice and timely pays the Termination Fee as required above, then the Lease will be terminated effective on the Termination Effective Date.

Tenant shall not have the right to terminate this Lease if it fails either timely to deliver the Termination Notice or timely to pay the Termination Fee. Tenant shall not have the right to exercise its Termination Right if, at the time of exercise, Tenant is in default hereunder in the payment of Base Rent and if such default continues uncured beyond the applicable period of grace. . . .

(Id.)

On March 11, 2010, NCO sent a letter to Montgomery Park notifying Montgomery Park of its election to terminate the Lease pursuant to its Limited Right of Early Termination. On May 12, 2010, NCO sent another letter to Montgomery Park confirming its earlier communication concerning the same. On that same day, NCO paid Montgomery Park $779,964.15, representing fifty-percent of the

Termination Fee as calculated by the Base Rent as well as an estimate of the increase in Additional Rent. On or before December 15, 2010, NCO paid Montgomery Park an additional $697,100.55, representing what it claimed to be the second fifty-percent of the Termination Fee after deducting $79,067.70 as a janitorial credit, to which it claims it is entitled.

Montgomery Park notified NCO, by letter dated February 9, 2011, that its attempt to exercise the Limited Right of Early Termination under the Lease was ineffective. Montgomery Park stated that its year-end accounting review concluded that the second amount NCO paid to terminate the lease in connection with the Early Termination Provision was incorrect because the Janitorial Allowance should not have been deducted. Pursuant to its position that it properly terminated the Lease, NCO vacated the Premises on May 31, 2011 and has not paid Rent since. By letter dated July 13, 2011, Montgomery Park gave NCO notice that it considered NCO in default for failure to pay Rent.

NCO filed its Complaint (ECF No. 1) on February 28, 2011, alleging breach of contract (Count I), unjust enrichment (Count II), and fraud (Count III) (collectively, the "Overcharge Claims"),[3] and seeks a declaratory judgment regarding its purported exercise of rights under the early termination clause of its lease (Count IV). In its counterclaim, Montgomery Park seeks a declaratory

_____

[3] These claims are all premised upon the allegation that the rentable square footage of the Premises is less than what is stated in the Lease.

judgment that the Lease was not terminated early and remains in full force and effect. Montgomery Park also seeks contract damages for NCO's default under the Lease for failure to pay Rent.

Pursuant to Local Rule 105.2(c), the parties proposed, and this Court adopted, a briefing schedule for the parties to submit motions for partial summary judgment. (ECF No. 50). On May 16 2013, NCO filed the instant Motion seeking summary judgment on the following facts and legal issues in this case: (1) the Premises, as defined by the Lease, does not include the area known to the parties as the "Bridge," (2) upon rendering the second fifty-percent of the Termination Fee, less the Janitorial Allowance before December 15, 2011, NCO properly terminated the Lease under the Early Termination Provision, and (3) the Parties agreed that the number of rentable square feet to be included in the Lease would be determined by using the then existing office measurement standard of BOMA.

On June 17, 2013 Montgomery Park filed its Opposition to NCO's Motion and Cross-Motion for Partial Summary Judgment. (ECF No. 52). In its Cross-Motion for Partial Summary Judgment, Montgomery Park seeks judgment barring NCO's Overcharge Claims pursuant to the statute of limitations. NCO filed a Reply and Response in Opposition to Montgomery Park's Cross-Motion for Partial Summary Judgment (ECF No. 53). Montgomery Park filed a Reply. (ECF No. 54).

Montgomery Park then moved for Leave to File a Sur-Reply seeking to address an "operating expenses" argument it contends was untimely advanced by NCO for the first time in NCO's Reply in Support of its Motion for Partial Summary Judgment, and seeking to address several misstatements of the record. (ECF No. 55). NCO opposed Montgomery Park's Motion arguing the "operating expenses" theory was implicit in its opening Memorandum concerning the Janitorial Allowance at issue in this case. (ECF No. 56). Montgomery Park filed a Reply to NCO's opposition. The Motion for Leave to File a Sur-Reply is now ripe for disposition.

## II. DISCUSSION

### A. <u>Standards of Review</u>

#### 1. The Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (citing <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 157 (1970)). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986). "[T]he mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson</u>, 477 U.S. at 247-48.

A "material fact" is a fact that might affect the outcome of a party's case. <u>Id.</u> at 248; <u>JKC Holding Co. v. Wash. Sports Ventures, Inc.</u>, 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 265 (4th Cir. 2001).

A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. <u>Anderson</u>, 477 U.S. at 248. Rule 56(c) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986). The nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." <u>Beale v. Hardy</u>, 769 F.2d 213, 214 (4th Cir. 1985).

Because this case arises under the Court's diversity jurisdiction, the substantive law to be considered is that of the

state in which the action arose. <u>Estrin v. Natural Answers, Inc.</u>, 103 F.App'x 702, 704 (4th Cir. 2004). In this case, Maryland law applies.

**2. Contract Interpretation Standard**

"Leases are contracts and, as such, are to be construed by application of the well established [sic] rules of contract interpretation." <u>Chesapeake Bank of Md. v. Monro Muffler/Brake, Inc.</u>, 891 A.2d 384, 390 (Md.Ct.Spec.App. 2006). Contract interpretation is a matter of law, not fact. <u>Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC</u>, 829 A.2d 540, 544 (Md. 2003). The parol evidence rule precludes parties from attempting to contradict written terms of an agreement through the use of prior oral or written declarations. <u>Sagent Tech., Inc. v. Micros Sys., Inc.</u>, 276 F.Supp.2d 464, 468 (D.Md. 2003). Parol evidence "is only admissible after the court finds the contract to be ambiguous." <u>Sy-Lene</u>, 829 A.2d at 544.

"In determining whether a writing is ambiguous, Maryland has long adhered to the law of the objective interpretation of contracts." <u>Calomiris v. Woods</u>, 727 A.2d 358, 363 (Md. 1999). Under the objective view, a contract is only ambiguous when it is susceptible to more than one meaning by a "reasonably prudent person." <u>Id.</u> "The terms of the contract must be interpreted in context and be given their ordinary and usual meaning." <u>Middlebrook Tech, LLC v. Moore</u>, 849 A.2d 63, 79 (Md.Ct.Spec.App. 2004).

If a contract is unambiguous, its terms will not be overridden by what the parties thought or intended the contract to mean when they executed it. <u>Id.</u>

> [W]hen the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away to what the parties thought that the agreement meant or intended it to mean.

<u>Gen. Motors Acceptance Corp. v. Daniels</u>, 492 A.2d 1306, 1310 (Md. 1985). Thus, evidence of the parties' prior intentions and negotiations are not admissible. <u>Id.</u>

**B.     Analysis**

**1.    BOMA Office Measurement Standards**

The Court finds that even if it were to consider parol evidence under the "conditional delivery" exception to the parol evidence rule, there exists a genuine dispute of material fact as to whether the parties agreed to be bound by BOMA. Accordingly, NCO is not entitled to summary judgment on this issue.

The Lease is silent on the standards used to arrive at the number of usable square feet of the Premises for the purposes of calculating rent. It is undisputed, however, that before the Lease was finalized and signed, the parties agreed that the number of usable square feet of the Premises would be determined pursuant to the BOMA office measurement standard. As a result, NCO argues the

effectiveness of the Lease was conditioned on Montgomery Park having measured the Premises according to the BOMA standard. The Court disagrees.

The notion of conditional delivery has long been recognized in Maryland – that "the parol evidence rule does not prevent the introduction of parol evidence indicating that the written instrument was not to become effective as an instrument, until a prior condition or event had occurred." Foreman v. Melrod, 263 A.2d 559, 562 (Md. 1970) (citing Jenkins v. First Nat'l Bank, 106 A. 174 (Md. 1919); Ricketts v. Pendleton, 14 Md. 320 (1859)); see also Saliba v. Arthur Fulmer Charlotte, Inc., 270 A.2d 656, 659 (Md. 1970) and Smith v. Rosenthal Toyota, Inc., 573 A.2d 418, 422 (Md.Ct.Spec.App. 1990) (allowing parol evidence to establish that agreements signed prior to the conditions set forth were not to become effective until the condition or event had occurred). Even where there is an integration clause, as there is here (Office Lease Agreement § 17.01), "[w]here the parties to a written agreement agree orally that performance of the agreement is subject to the occurrence of a stated condition, the agreement is not integrated with respect to the oral condition." Smith, 573 A.2d at 422 (quoting Restatement (Second) of Contracts § 217 (1981)). The written document must not be sufficient standing alone, to determine that "the contract never came into existence by reason of the failure of the condition." Saliba, 270 A.2d at 660 (quoting Brantley on Contracts 304 (2d Ed. Rev. 1922) (internal quotation

12

marks omitted); see also Smith, 573 A.2d at 422 (discussing the principle of allowing parol evidence of oral conditions).

NCO concedes the occurrence of the measurement was a condition precedent to the signing of the Lease.  Pursuant to that agreement, the measurements were concluded and inserted into the Lease prior to NCO signing it.  Simply because the approximate rentable square footage was determined before the Lease was executed, however, does not mean the occurrence of that measurement was a condition precedent to the legal effectiveness of the Lease itself.[4] Nevertheless, even if the Court were to look beyond the four corners of the Lease, the parol evidence creates a material dispute of fact as to whether the parties agreed to be contractually bound by BOMA.

NCO first directs the Court's attention to the August 1, 2002 Letter of Intent, which requires that the "[t]enant area shall be measured in accordance with BOMA standards of measurement." (Pl.'s Mem. Supp. Mot. Partial Summ. J. Ex. 2, Attach. 1, at 1). According to the deposition testimony of Montgomery Park's architect, Peter Notari, and its Director of Development at the time, Peter Garver, Montgomery Park did in fact provide the measurement of the Premises pursuant to the BOMA standards of

---

[4] NCO argues Section 2.08 of the Lease provides that the formula for determining the number of Rentable Square Feet required the number of Usable Square Feet to be determined before the execution of the Lease.  When viewed in the context of the Lease in its entirety, however, Section 2.08 seems to indicate only how the approximate rentable square footage was calculated for purposes of arriving at the Rent due under the Lease.

measurement.  (Notari Dep. 45:4-7, Dec. 20, 2012); (Garver Dep. 30:15-31:2, Dec. 11, 2012).  The parties, however, later consciously agreed not to be contractually bound by the BOMA standard in the lease.  (See Mem. Opp'n Pl.'s Mot. Partial Summ. J. & Supp. Cross-Mot. Partial Summ. J. ["Def.'s Mem. in Opp'n"] Ex. 2, at 64) (appearing to be a prior draft of the Lease in which a specific reference requiring the parties to be bound by BOMA in section 2.08 is stricken). Accordingly, NCO is not entitled to summary judgment that the Parties agreed the number of rentable square feet to be included in the Lease would be determined by using the then-existing office measurement standard of BOMA.

### 2.  The Bridge

The Court concludes, as a matter of law, that the Lease clearly and unambiguously excludes the Bridge from its Premises and, therefore, the area should not have been considered rentable square footage.  Accordingly, NCO will be granted summary judgment with respect to this issue.

It is undisputed that an area known to the parties as the "Bridge" is reflected in the approximate rentable square footage stated on the Lease and referred to as the "Premises."  Montgomery Park argues, because the "approximately 106,267 rentable square feet" indisputably includes the square footage of the Bridge, this is evidence that the Bridge is part of the Premises as defined in the Lease.  The Court disagrees.

After identifying the "approximately 106,267 rentable square feet" as the "Premises," the Lease then defines Premises as "(i) Section 2 on the first floor and (ii) Sections 1, 2, and 4 . . . on [the] second floor . . . ." (Mem. Supp. Mot. Partial Summ. J. Ex. 2, Attach. 2, at 9). Thus, the rental square footage identified as the Premises should include only those designated areas of the building intended to be part of NCO's Premises as defined in the Lease. The parties' agreement that the Bridge is included in the calculation of rentable square footage is not evidence that it should have been included or that either party knew it was included.

The written definition of the Premises then identifies Exhibit A-1 as a more particular illustration of the Premises. (<u>Id.</u>) Montgomery Park further argues the drawings, attached to the Lease as exhibits and purporting to further define the Premises, creates both patent and latent ambiguities such that the Court must consider parol evidence to glean the parties' intent with respect to whether the Bridge was intended to be part of the Premises. The Court similarly disagrees.

Page 4 of Exhibit A-1 is identified as "NCO Call Center – Second Floor Key Plan." It indicates cross-hatching in Sections marked 1, 2, and 4, and the absence of cross-hatching in Sections marked 3 and 5. The Bridge, which appears as a narrow area that connects Sections 4 and 5, is not cross-hatched. The cross-hatching directly corresponds to those sections identified in the

written definition.  Thus, under the clear language of the Lease, the Court finds that a reasonable person would interpret the cross-hatching as intending to define the leased Premises.

Page 5 of Exhibit A-1 is a more detailed drawing of the entire second floor of the building.  The drawings on pages 4 and 5 appear to work together.  Page 4 first identifies and defines the designated areas of the building included in NCO's Premises and page 5 then compliments with additional architectural detail.  Page 5 of the Exhibit does not, however, identify or designate which portions of the second floor further define the Premises.  Even though the drawing on page 5 includes the Bridge and portions of Sections 3 and 5 that are not defined in the written definition of the property, there is no ambiguity when considering pages 4 and 5 together.

Moreover, Exhibit G of the Lease, titled "Space Plans for NCO Premises," consists of a Cover Sheet, a First Floor and Second Floor Life Safety Plan, four Architectural Plans and Reflected Ceiling Plans for each of the areas of the building designated as being part of the Premises in the written definition, and four wall types and toilet room elevations sheets.  In the lower right hand corner of each page is a miniature drawing identical to the one at page 4 of Exhibit A-1.  In each instance, the corresponding section is identified through shading similar to the cross-hatching appearing on the original diagram at page 4 of Exhibit A-1.  The Bridge is never identified or shaded.

"In interpreting a contract provision, [the Court] look[s] to the entire . . . agreement, not merely a portion thereof." Nova Research, Inc. v. Penske Truck Leasing Co., 952 A.2d 275, 283 (Md. 2008). Thus, the Court must consider the written description of the Premises together with Exhibits A-1 and G. Neither the written description nor any of the drawings of the Premises in the Lease include the Bridge. As such, the Lease is not subject to more than one reasonable interpretation with regard to whether the Bridge is part of NCO's premises.

An ambiguity cannot be created from extrinsic evidence when the contract is clear on its face. See United Capitol Ins. Co. v. Kapiloff, 155 F.3d 488, 495 (4th Cir. 1998) ("In the event of ambiguity, Maryland courts consult extrinsic evidence . . . ."). To the extent that Montgomery Park relies on inadmissible extrinsic evidence to identify ambiguities in the Lease, those arguments will not be addressed.

Finally, Montgomery Park contends that the Bridge's inclusion in the leased Premises is not a "material fact" that might affect the outcome of case and, therefore, NCO is not entitled to summary judgment. This argument, however, is misplaced. NCO seeks partial summary judgment with respect to this one very narrow issue. How this issue impacts the merits of NCO's underlying case does not bear on whether it is entitled to summary judgment on that narrow issue. Only disputes over material facts that might affect the outcome of whether the Bridge is included in the leased Premises

under the governing law will properly preclude the entry of summary judgment on this issue.

After considering the parties' arguments, the written definition of Premises used in the Lease, and Exhibits A-1 and G, as attached to the Lease, the Court finds that the Lease clearly and unambiguously does not include the Bridge as part of NCO's Premises. Accordingly, NCO is entitled to summary judgment declaring the same.

### 3. Termination Fee

#### a. Motion for Leave to File Sur-Reply

The Court finds good cause to allow Montgomery Park leave to file a sur-reply with respect to NCO's operating expenses argument.

Unless otherwise ordered by the court, sur-reply memoranda are not permitted to be filed. See Local Rule 105.2(a) (D.Md. 2011). "Surreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." Khoury v. Meserve, 268 F.Supp.2d 600, 605 (D.Md. 2003), aff'd, 85 F.App'x 960 (4th Cir. 2004).

Montgomery Park contends NCO's claim that the costs of providing tenant janitorial services was an "Operating Expense" within the meaning of the Lease and constituted, therefore, a form of "Additional Rent" was raised for the first time in NCO's Reply to Montgomery Park's Opposition to NCO's Motion for Partial Summary Judgment thereby necessitating a sur-reply on that issue. The Court agrees.

NCO argued, in its Motion for Partial Summary Judgment, the Janitorial Allowance was a "credit against rent" due under the Lease. In its Opposition to Montgomery Park's Motion for Leave to File a Sur-Reply, NCO concedes that it did not make this argument specifically in terms of "Operating Expenses" and "Additional Expenses" under the Lease, but maintains that the distinction is immaterial. (Mem. Opp'n Montgomery Park's Mot. Leave to File Sur-Reply 2, ECF No. 56-1). NCO states that implicit in its "credit against rent" argument is the concept of the Janitorial Allowance qualifying as a component of rent through the operating expense provision in the Lease. (Id. at 3).

The terms "Operating Expenses," "Additional Rent," and "Rent" are specific terms defined in the Lease. The term "credit against rent" is a concept NCO asks the Court to read into the Lease. In its Reply to Montgomery Park's Opposition, NCO first articulates its right to take a credit against rent specifically under the operating expense provision in the Lease. Moreover, the phrase "operating expense" never even appears in NCO's Motion for Partial Summary Judgment.

In addition to addressing NCO's operating expenses argument, Montgomery Park seeks to use its sur-reply to address alleged misstatements of the record in NCO's Reply. Where the proposed sur-reply, however, does not attempt to address matters presented for the first time in the opposing party's reply and instead seeks merely to re-open briefing on the issues raised, the motion for

leave to file a sur-reply will be denied. <u>See</u> <u>Interphase Garment</u> <u>Solutions, LLC v. Fox Television Stations, Inc.</u>, 566 F.Supp.2d 460, 467 (D.Md. 2008) (denying a motion to file surreply because it sought to re-open briefing and challenge Defendants' explanations of cited case law).

Accordingly, Montgomery Park's Motion for Leave to file a Sur-Reply will be granted with respect to NCO's operating expenses argument but denied with respect to its allegations that NCO misstated the record. Exhibit 1 to Montgomery Park's Motion for Leave to File Sur-Reply (ECF No. 55-1) will be deemed filed, and only the portion addressing NCO's untimely operating expenses argument will be considered in connection with the Court's decision on the parties' motions for summary judgment.

### b. Analysis

NCO seeks a finding as a matter of law that upon rendering the second fifty-percent of the Termination Fee, less the Janitorial Allowance before December 15, 2011, it properly terminated the Lease under the Early Termination Provision. Montgomery Park seeks a finding that, by deducting the annual Janitorial Allowance from the Termination Fee, NCO did not pay the Termination Fee as required by the Lease, and thus, the Lease remains in full force and effect. The Court finds that despite NCO's improper calculation of the Termination Fee, its good faith attempt to strictly comply with the conditions precedent set out in the Early

Termination Provision of the Lease amounts to proper performance
with respect to effectuating its early termination option.

### (1) The Janitorial Allowance Should Not Have been Included in the Calculation of the Termination Fee

Two separate "components" of rent are detailed in Article II
of the Lease.   Section 2.01 sets out "a minimum annual rent,"
referred to as "Base Rent."   (Office Lease Agreement at 19).
Section 2.04(A) identifies all rental obligations, outside of Base
rent, as "Additional Rent."   Sections 2.02 and 2.03 then identify
the additional rental obligations to include Real Estate Taxes and
Operating Expenses.

When read together, Sections 2.03 and 2.04(A) clearly and
unambiguously set forth "Operating Expenses" as a component of
rent.  "Operating Expenses" are defined as "all expenses, costs and
disbursements of every kind and nature **incurred** in connection with
the ownership, management, maintenance, repair and operation of the
Property, including but not limited to. . . **common area janitorial
services**."  (Id. § 2.03(A)) (emphasis added).  Conversely, Section
6.01 states that:

> [L]andlord shall procure janitorial services for Tenant
> at the Premises at Tenant's request, unless Tenant
> contracts (at Tenant's election) with its own janitorial
> service provider; provided, however, Landlord shall
> provide Tenant with an annual janitorial allowance (the
> "Janitorial Allowance") of up to $1.00 per usable square
> foot per annum **towards the costs incurred** in obtaining
> janitorial services.

(Id. § 6.01) (emphasis added).

Based on the plain language of the Lease, Operating Expenses include only common area janitorial costs. The Operating Expenses component of Rent is silent on the issue of tenant-specific janitorial costs, which are plainly addressed in a separate section that is specific with respect to how those costs will be allocated between the parties. Thus, on the face of the Lease, Montgomery Park's annual credit obligation with respect to the Janitorial Allowance is unambiguously separate from NCO's monthly rent obligation.

Unlike "Rent," which is the payment obligation of NCO, the Janitorial Allowance is a credit obligation of Montgomery Park **toward the costs incurred** in obtaining janitorial services whether procured by the Landlord or the Tenant. NCO vacated the Premises on May 31, 2011. Under circumstances in which neither Montgomery Park nor NCO were no longer incurring the costs of janitorial services, NCO is not entitled to the Janitorial Allowance. Thus, the Court finds that NCO did not properly calculate the required Termination Fee. To the extent that NCO relies on inadmissible extrinsic evidence in support of its position, those arguments will not be addressed.

### (2) NCO Did Properly Exercise its Early Termination Option

Montgomery Park argues, by improperly deducting the annual Janitorial Allowance from the Termination Fee, NCO failed to effectuate its early termination option because it did not strictly

comply with the Early Termination Provision's conditions precedent. The Court disagrees.

The words and phrases specifically employed in Section 1.05 of the Lease clearly and unambiguously provide that exercise of the early termination option requires strict compliance with specified conditions precedent:[5]  "Tenant shall have a one-time, **conditional** right to terminate"; "upon Tenant's **strict compliance** with all of the following requirements"; "**[i]f** (**and only if**) Tenant both timely delivers . . . and timely pays"; and "Tenant shall not have the right to terminate this Lease if it fails . . . ."  (Office Lease Agreement at § 1.05) (emphasis added).

Under Maryland Law, the exercise of an option must be in "exact accord with the terms of the option."  Foard v. Snider, 109 A.2d 101, 106 (Md. 1954); see also Katz v. Pratt St. Realty Co., 262 A.2d 540, 547 (Md. 1970) ("It is well settled that to be valid, the exercise of an option must be unequivocal and in accordance with the terms of the option.").  Maryland courts have differed, however, as to the extent in which the exact matching requirement

---

[5]  See Chesapeake Bank of Md., 891 A.2d at 391 ("The question whether the stipulation in a contract constitutes a condition precedent is one of construction dependent on the intent of the parties to be gathered from the words they have employed . . . . Although no particular form of words is necessary in order to create an express condition, such words and phrases as 'if' and 'provided that,' are commonly used to indicate that performance has expressly been made conditional . . . .") (citing Chirichella v. Erwin, 310 A.2d 555, 557 (Md. 1973) (internal quotation marks omitted)).

is applied when determining whether an option has been permissibly exercised. <u>Elderkin v. Carroll</u>, 941 A.2d 1127, 1133 (Md. 2008). Most recently, in <u>Elderkin</u>, the Maryland Court of Appeals outlined three inquiries for determining whether the exercise of an option is valid:

> (1) [I]s the acceptance in accordance with the terms of the offer? (2) Do the non-matching terms fall under any of the exceptions enunciated in <u>Bramble</u>? (3) Where the terms are not in accordance, was it merely an 'additional term' that could be rejected by the optionor or was it a non-material covenant rather than a condition?

<u>Id.</u> at 1135.

It was in <u>Beckenheimer's Inc v. Alameda Associates Ltd. P'ship</u>, 611 A.2d 105, 109 (Md. 1992) the Maryland Court first made the distinction between an absolute condition, which would have to be fulfilled in order to trigger the acceptance of an option, or a mere covenant, which would not bar an otherwise valid attempt to exercise an option. In <u>Beckenheimer's Inc.</u>, the trial court granted summary judgment to the optionor after finding that the optionee had failed to renew the sublease in accordance with its terms. <u>Beckenheimer's Inc.</u>, 611 A.2d at 109. The optionee gave timely notice of its intent to renew the lease, but failed to include a statement of financial worth, a requirement which was included in the condition provision but separated from the condition language by parentheses. <u>Id.</u> at 107-08. On appeal, the Court of Appeals of Maryland found the requirement to include a financial statement with the notice of renewal to be a covenant and

not a condition, and further found the optionee's failure to include the financial statement a non-material breach. Id. at 113-14.

Here, there are two express conditions in the Early Termination Provision: (1) NCO's delivery to Montgomery Park of a written notice, and, (2) payment of a termination fee.[6] (See Office Lease Agreement at § 1.05). It is undisputed that NCO both timely delivered the Termination Notice and timely paid the Termination Fee.

Montgomery Park contends the language of the Early Termination Provision describing the termination fee as being equal to ten times the monthly installment of Rent is part of the condition precedent to timely pay. Having unilaterally rejected the first two exceptions to the "exact matching" requirement laid out in Elderkin, the Court now considers whether proper calculation of the termination fee was a required condition, or a non-material covenant, which if not matched exactly, will not bar NCO's early termination. "Unless the agreement makes it clear that the event is required as a condition, it is fairer to apply . . . more flexible rules." See Beckenheimer's Inc., 611 A.2d at 114.

---

[6] "[W]hether expressly declared to be so or not," time is of the essence in option contracts, "both in law and in equity." Beckenheimer's Inc., 611 A.2d at 111 (quoting Foard v. Snider, 109 A.2d 101, 105-06 (Md. 1954)). Thus, despite the durational terms being separated from the conditions by parentheses, the Court finds all durational requirements to be express conditions.

The Court concludes that the Lease does not make clear that proper calculation of the termination fee is a required condition of early termination. Section 1.05 of the Lease contains competing clauses with respect to the required conditions. First, the provision indicates: "If (and only if) Tenant both timely delivers the Termination Notice and timely pays the Termination Fee **as required above**, then the Lease will be terminated effective on the Termination Effective Date." (Office Lease Agreement at § 1.05). The Next sentence, however, indicates: "Tenant shall not have the right to terminate this Lease if it fails either timely to deliver the Termination Notice or timely to pay the Termination Fee." (Id.). While the first clause may suggest proper calculation should be considered a condition to the right to terminate, the immediate following clause does not.

Further, implicit in the fact that the "Additional Rent" component must be calculated into the termination fee, is that the parties would have to engage in an accounting of those additional expenses before ultimately determining appropriate adjustments in the final fee. Under the interpretation suggested by Montgomery Park, it could dispute any amount estimated by NCO to be the proper termination fee in the event NCO's calculation did not match identically to its own. The Court concludes that such an interpretation would lead to an "absurd or unreasonable result," and, therefore, declines to adopt Montgomery Park's interpretation. See Chesapeake Bank of Md., 891 A.2d at 401 (quoting Middlebrook

26

<u>Tech, LLC v. Moore</u>, 849 A.2d 63, 79 (Md.Ct.Spec.App. 2004)) ("[T]he court's interpretation should not permit an absurd or unreasonable result."). Thus, the Court will apply a more flexible standard than "exact matching" in determining whether NCO effectuated its Early Termination option.

NCO timely delivered to Montgomery Park a termination notice accompanied by $779,964.15, representing fifty-percent of the Termination Fee as calculated by the Base Rent as well as an estimate of the increase in Additional Rent. NCO then timely delivered to Montgomery Park $697,100.55, representing what it estimated to be the second fifty-percent of the Termination Fee, albeit less the Janitorial Allowance the Court previously found it was not entitled to take. The Court, however, concludes that under these facts, NCO's good faith attempt to strictly comply with the conditions precedent amounts to proper performance of the Early Termination option, and that NCO's failure to properly calculate the Termination Fee was a non-material breach subject to remedy. Thus, there is no genuine dispute of material fact, and the Court finds NCO properly terminated the Lease under the Early Termination Provision without prejudice to Montgomery Park's right to reconcile the disparities in the final amount.

### 4. Overcharge Claims

The Court finds that Maryland's three-year statute of limitations does not bar NCO's Overcharge Claims.

Montgomery Park argues NCO could have discovered the discrepancy in rentable square footage prior to executing the Lease in October 2002, or anytime during its tenancy, through the exercise of due diligence. Thus, Montgomery Park argues, Counts I, II, and III of NCO's Complaint are barred by Maryland's statute of limitations. The Court disagrees.

The parties agree that the Overcharge Claims are governed by Maryland's three-year statute of limitations.[7] The parties also agree that Maryland's discovery rule applies.[8] This lawsuit was filed on February 28, 2011. Thus, NCO's Overcharge Claims were timely filed unless Montgomery Park can establish there is no dispute NCO knew, or through the exercise of reasonable diligence, should have known, it was being overcharged for its Rent on or before February 28, 2008.

Montgomery Park does not suggest that NCO was actually aware of its cause of action, but only that NCO had inquiry notice of the facts giving rise to its overcharge claims prior to February 28, 2008. "Being on inquiry notice means having knowledge of circumstances which would cause a reasonable person . . . to

---

[7] See Md. Code Ann., Cts. & Jud. Proc. § 5-101 (West 2013); see also Singer Co., Link Simulation Sys. Div. v. Balt. Gas & Elec. Co., 558 A.2d 419, 424 (Md.Ct.Spec.App. 1989) ("Section 5-101 governs the limitations period applicable to common law contract actions.").

[8] "Under the discovery rule an action is deemed to accrue on the date when the plaintiff knew or, with due diligence, reasonably should have known of the wrong." Supik v. Bodie, Nagle, Dolina, Smith & Hobbs, P.A., 834 A.2d 170, 178 (Md.Ct.Spec.App. 2003) (quoting Doe v. Archdiocese of Wash., 689 A.2d 634, 638 (Md.Ct.Spec.App. 1997)).

undertake an investigation . . . ." <u>Anne Arundel Cnty. v. Halle</u>
<u>Dev., Inc.</u>, 971 A.2d 214, 228 (Md. 2009) (citing <u>O'Hara v. Kovens</u>,
503 A.2d 1313, 1324 (Md. 1986) (internal quotation marks omitted)).

Montgomery Park argues (1) use of the word "approximately" in
the Lease was, in and of itself, sufficient to put NCO on inquiry
notice of an alleged measurement discrepancy; (2) between the date
NCO executed the Lease and then later occupied the Premises, it
never attempted to measure the Premises; and (3) NCO never verified
the accuracy of Montgomery Park's measurement during its tenancy
despite having the opportunity to do so. Thus, Montgomery Park
urges the Court to conclude, as a matter of law, that NCO was on
inquiry notice of the measurement discrepancy at the time it
entered into the Lease and took possession of the Premises.

Despite Montgomery Park's reference to a number of cases from
other jurisdictions purporting to be instructive on these facts,
this Court finds no controlling precedent and "little consensus in
other jurisdictions" on the issue of when a tenant is reasonably on
notice of a discrepancy in square footage. (Mem. Op. at 4, ECF No.
27). Moreover, this Court previously declined to rule "as a matter
of law, that even a sophisticated commercial tenant must be aware
of any material discrepancy in square footage from day one." (<u>See</u>
<u>id.</u> at 5). In renewing this argument at summary judgment, as
permitted by the Court, Montgomery Park offers the same set of
facts and cites the same case law previously considered by the
Court in Montgomery Park's Motion to Dismiss. To the extent the

Court's prior opinion addresses these arguments, it declines to reconsider its previous decision. See Major v. CSX Transp., 278 F.Supp.2d 597, 615 (D.Md. 2003) ("[A] court will not reconsider its own decision rendered at an earlier stage of the litigation absent clear and convincing reasons to reexamine the prior ruling."). The Court, however, agrees that it did in fact invite the development of a factual record demonstrating when NCO gained information that would reasonably put it on notice of such a discrepancy.

In this respect, Montgomery Park relies upon the following facts. NCO is a sophisticated tenant that, in connection with the Lease, was represented by a commercial real estate broker and outside counsel. At no time prior to executing the Lease in October 2002, did NCO attempt to verify the accuracy of the approximate rentable square footage to which it later agreed to in the Lease. NCO agreed to forego a true-up provision in the Lease through which it could have discovered and remedied the purported overcharge.

These facts relate to a time period prior to the Lease being executed. The statute of limitations cannot begin to run prior to the breach See Supik, 834 A.2d at 180 ("[W]e highlight the fact that none of these tolling concepts is even relevant until a plaintiff has sustained a legal injury, and a cause of action has 'arisen.'"); See also Singer Co., 558 A.2d at 425 ("[W]hile the discovery rule may . . . delay the accrual of a contract matter, it cannot operate to make such an action accrue earlier than the date

of the breach . . . .").  Accordingly, Montgomery Park's Motion for Summary Judgment will be denied.[9]

### III. CONCLUSION

For the foregoing reasons, this Court will, by separate Order, GRANT in part and DENY in part NCO's Motion for Partial Summary Judgment (ECF No. 51); GRANT in Part and DENY in Part Montgomery Park's Motion for Leave to File Sur-Reply in Further Opposition to NCO's Motion for Partial Summary Judgment (ECF No. 55); and DENY Montgomery Park's Cross-Motion for Partial Summary Judgment (ECF No. 52).

Entered this 20th day of December, 2013

/s/

_____
George L. Russell, III
United States District Judge

---

[9] Having determined the Overcharge Claims are not barred by the statute of limitations, the Court will dispense with analysis of NCO's argument that it is entitled to bring its Overcharge Claims under the "continuing harm" exception to the statute of limitations.